Filed 01/31/24

# STATE OF VERMONT

SUPERIOR COURT
Lamoille Unit

CIVIL DIVISION

| | | |
|---|---|---|
| GARRET HIRCHAK,<br>　　Plaintiff | ) ) ) | Docket No. 118-12-20 Lecv |
| v. | ) ) | |
| TYLER HIRCHAK, THOMAS HIRCHAK III,<br>and HIRCHAK BROTHERS LLC,<br>　　Defendants | ) ) ) ) | |

| | | |
|---|---|---|
| MANUFACTURING SOLUTIONS, INC. and<br>SUNRISE DEVELOPMENT LLC ,<br>　　Plaintiffs | ) ) ) ) | Docket No. 21-CV-1922 |
| v. | ) ) | |
| HIRCHAK BROTHERS LLC,<br>　　Defendant | ) ) | |

| | | |
|---|---|---|
| TYLER HIRCHAK and<br>THOMAS HIRCHAK III,<br>　　Plaintiffs | ) ) ) ) | Docket No. 23-CV-1511 |
| v. | ) ) | |
| GARRET HIRCHAK,<br>　　Defendant/Third Party Plaintiff | ) ) ) | |
| v. | ) ) | |
| HIRCHAK GROUP LLC<br>　　Third Party Defendant | ) ) | |

## DECISION ON THE MERITS

A court trial was held on three consolidated cases involving related persons and entities. The three persons are Garret, Tyler, and Thomas (hereinafter "Toby") Hirchak, who are brothers who took over the business of their father Thomas Hirchak (hereinafter "Tom") when he retired.

1

To do so they formed two LLCs: Hirchak Brothers LLC, which owns and operates the business, and Hirchak Group LLC, which owns related real estate that it leases to Hirchak Brothers LLC. Garret is also the sole owner of two separate businesses, Manufacturing Solutions, Inc. (MSI) and Sunrise Development LLC (Sunrise), which are also parties and have provided services to Hirchak Brothers LLC.

In 118-12-20 Lecv, Garret initially sought dissolution and winding up of the LLCs, but has revised his request for relief. He no longer seeks dissolution. His preferred outcome is for his brothers to acquire his one-third share in Hirchak Brothers LLC, and for him to acquire their two-thirds share in Hirchak Group LLC. His alternate preference is for his brothers to buy out his shares in the LLCs. He also claims reimbursement for cash advanced to Hirchak Brothers LLC. [1]

In 21-CV-1922, MSI and Sunrise seek to collect on invoices billed to Brothers LLC.

In 23-CV-1511, Tyler and Toby seek to dissociate Garret from both LLCs, and seek disgorgement of profits on a claim of unjust enrichment.

The trial took place on December 5-8, 2023, with proposed findings of fact and legal memos and responses filed thereafter. Garret, MSI, and Sunrise are represented by Attorney Christopher D. Roy. Tyler and Toby and the two LLCs are represented by Attorneys Kevin M. Henry and Angélina L. Debeaupuis.

Based on the credible evidence, the court makes the following Findings of Fact and Conclusions of Law.

**Findings of Fact**

Thomas Hirchak ("Tom") started an auctioneering business on Cadys Falls Road in Morrisville in the mid-1970s. His three sons, who are the individual parties to these cases, all worked actively in the business from an early age, working after school and on weekends and in summers, assisting at personal property and real estate auctions both at the business site in Morrisville and throughout the state. After graduating from high school in the 1980's, Tyler and Toby continued to work full time in the business, and they have never worked elsewhere. Garret left the family business after high school and went out on his own. He has been quite successful and now owns businesses including MSI, a manufacturing production company which he founded 27 years ago and now has 225 employees, and Sunrise, which he owns with his wife and which owns approximately 30 commercial and industrial real estate properties. He also owns MSI Realty LLC, a company started in 2020 for sales of real estate.

Tom's business, hereinafter THCo, was also successful, and grew to include auto auctions. It acquired a site in Williston which it used for weekly auto actions while continuing to use its Morrisville site as well, and it conducted auctions statewide. Tom worked 60-70 hours a week in all phases of the business as sole owner. Tyler and Toby also worked 50-60 hours a week, doing whatever needed to be done despite being salaried workers. They had a reasonable expectation of running the business themselves one day, although terms were not discussed.

---

[1] Hereinafter the LLCs are referred to as Brothers LLC and Group LLC.

Tom maintained tight control over business planning and finances. He did not share accounting, administrative, or expense information with Tyler and Toby. They never had knowledge of the ups and downs or overall condition of the business, although they had the general impression that it was successful. Bookkeeping was done by an in-house employee in the Morrisville office on Cadys Falls Road. Terry Owen first worked in the business as a bookkeeper. She gradually assumed more and more responsibilities for management and oversight of business finances in addition to selling real estate and managing auto auctions. In 2012 she married Tom, and in the later years of Tom's ownership, Terry had become general manager of the business. She supervised the bookkeeping and managed payroll and insurance and had upper level accounting oversight.

After several years of having no involvement in the family business, Garret began occasionally meeting with Tom to discuss issues of business strategy, but he did not work for or in the business. No specific steps were ever taken by Tom to involve Tyler or Toby in business or financial management. They acquired multiple auctioneering licenses and worked hard doing the work of the business but had no knowledge of its financial condition or expenses. The business grew and Tom acquired additional real estate holdings, all of which were held in his own name. No specific plans were ever discussed about business succession or estate planning until 2018.

The business developed three spheres of auctioneering activity: real estate, commercial, automobile. Tyler became more involved in real estate and Toby in commercial, and both worked the auto auctions. They also helped out as needed in all divisions. The three divisions complemented each other in terms of overall business functioning, as each division helped to generate business for the others, and there were phases when one was less active and another more active. They were apparently not managed as separate profit centers. Tom had a real estate broker's license so that he could sell properties that did not sell at auction, which also expanded their business. Tyler acquired an agent's license and worked under Tom's broker's license.

In 2015, Tom acquired a piece of real estate for $600,000 that was ideal for auctions and had the potential to expand and improve the business. The Bridge Street property had an abandoned skating rink and building on it and was zoned for recreational use. To be useful to THCo, it would need to be rezoned for commercial use and cleared. Tyler and Toby worked hard to make the property suitable for THCo use. Toby was extremely active in promoting community support for the needed zoning change by collecting signatures and attending many town meetings. Tyler and Toby removed concrete walls, cleaned out the building, and groomed and landscaped the property. The zoning change was successful. Tyler and Toby moved equipment into the building in anticipation of use of the property for auctions.

Then in 2017 Tom told them to move the THCo equipment out of the building. He had sold the property to Garret for $2.7 million. Tyler and Toby later learned from Garret that Tom wanted Tyler and Toby to receive the sum of 10% of the sale price, $270,000, apparently in recognition for their work, but Tom did not want to pay it to them directly. Garret said that he would be paying them each $135,000 over a 20 year period. Tyler and Toby were deeply disappointed in the loss of this business opportunity on which they had worked so hard. All of

this preceded the acquisition of the business by the brothers, and was entirely within the prerogative of both Tom and Garret, however disappointing to Tyler and Toby.

In 2017, Tom had the business valued in preparation for future financial planning and possibly sale of the business. He calculated that he would like to receive an income stream of $15,000 monthly from the business.

*2018*

In 2018, Garret instigated action on the part of Tom on the one hand and Tyler and Toby on the other toward future planning for the business. Garret essentially engaged in negotiations with Tom on behalf of all three brothers. Plans took shape for Tom to sell the business and the real estate to the three brothers. All three were excited about the opportunity to acquire and continue the family business. Tyler and Toby knew that Garret was a successful businessman and was financially knowledgeable.

In July, Garret filed papers to create two LLCs: Hirchak Brothers LLC and Hirchak Group LLC. Also in July, Garret made a payment of $100,000, apparently to Tom, that later became part of a down payment on the purchase of the real estate. It is unknown whether Tyler and Toby knew about this initial payment made by Garret. That same month Garret gave them a schedule of the annual payments that they would receive from the Bridge Street property over 20 years from 2017, starting in 2019 and ending in 2036. (Exhibit DDD). Garret then made the first payment to them in the amount of $15,000, a year earlier than specified on the schedule.

In September of 2018, the brothers agreed on the following general terms:

- They would be equal member owners of each of the two LLCs
- Brothers LLC would own and run the business, and Group LLC would own the business real estate and lease it to Brothers LLC
- None of them would receive distributions simply for being a member, but would only receive compensation for working on behalf of Brothers LLC
- Within Brothers LLC, each would be primarily responsible for one of the three divisions: Tyler for real estate, Toby for commercial, and Garret for auto
- Each would have equal overall management responsibility.
- Each would receive equal compensation. This was important to Garret. Tyler and Toby expected that each of the three would spend comparable time running the division for which he was responsible. Tyler asked Garret how he would manage to devote equal attention to Brothers LLC auto division when he owned and ran two other businesses of his own. He assured Toby that his other businesses were self-sufficient and that he would be able to work for Brothers LLC on an equal basis.[2]

---

[2] The LLC Operating Agreement subsequently signed by the brothers provides as follows:
"Other Business by Members: Each member shall agree not to own an interest in, manage or work for another business, enterprise or endeavor, if such ownership or activities would compete with this LLC's goals, mission,

4

- Garret told Tyler and Toby that it would be less expensive for the business for his share of compensation to be paid to MSI under an independent contract, rather than paying him personally as a W-2 employee, so that payroll tax could be avoided, and they agreed.

Other than these general parameters, no specific agreements were discussed or made about what work each was expected to do in exchange for compensation, nor was there discussion about how financial management would be handled. Tyler and Toby knew almost nothing about the financial condition of the business, but they had numerous auctioneering licenses and together approximately 75 years of auctioneering experience. It is unknown what Garret knew about the THCo business. He was, however, CEO of his own business, MSI, and had considerable experience in business management. They did not divide responsibilities that way, however. They planned to work as equal members, each responsible for one of the three divisions.

On September 14, 2018, the brothers signed identical Operating Agreements for the two LLCs. On the same day, Garret paid an additional $200,000 toward the real estate and signed a Purchase and Sales Agreement on behalf of Hirchak Group LLC to buy the real estate from Tom for $300,000 down plus $2.2 million. Tyler and Toby wanted to contribute their share toward the $300,000 down payment. While they were not as well off as Garret, they wanted to make equal investments as equal owners and they knew that they had over $100,000 coming to each of them from Garret as a result of the Bridge Street matter. They offered to use that toward the down payment so each would have made equal contributions, but Garret ignored their offer and paid the whole amount himself. He claims that they did not offer to contribute, but the court finds credible the testimony of Tyler and Toby that they offered and Garret ignored their offer and simply went ahead and made the payment on his own.

There was no discussion of how the $300,000 put in by Garret was to be treated. There was no agreement or documentation of it as a capital contribution to Group LLC[3] and there was no agreement that it was a loan. Aside from the $300,000, the purchase of the real estate was to be bank financed. Garret testified at trial that he assumed that he would be repaid for his upfront contribution, but the evidence is clear that there was no discussion or agreement between the brothers about this.

THCo was selling assets only and not business accounts. Moreover, THCo's bookkeeper was retiring at the same time as THCo assets were to be sold to Brothers LLC, so there was a need to set up a whole new set of books and financial systems for Brothers LLC. The brothers had only a limited period of time in which they had access to THCo's financial records in preparation for running the business themselves.

---

profitability or productivity, or would diminish or impair the member's ability to provide maximum effort and performance in managing the business of the LLC." Exhibits A and 13, Section II (9).

[3] The Operating Agreement provides: "Additional Contributions by Members: The members may agree, from time to time by unanimous vote, to require the payment of additional capital contributions by the members, on or by a mutually agreeable date." Exhibits B and 12, Section IV (2). There was no agreement to require any capital contributions, and no documentation of an additional capital contribution on the part of Garret.

Garret proposed that bookkeeping, accounting, human resources, and information technology (IT) functions for the new business all be done by his company MSI, which would bill for its services 'a la carte' as needed. Similarly, his real estate company, Sunrise, had staff that could provide 'a la carte' property maintenance services. He told the brothers that it would be more economical to pay for specific services by having each task separately invoiced from his companies rather than hire employees of Brothers LLC. Tyler and Toby relied on Garret's business knowledge and experience and accepted this recommendation.

MSI does this for other business companies as well. When it does, it presents a specific written proposal describing exactly what services it will provide, and the rate and basis for payment for each type of service. Exhibit 28 is a multi-page example that was prepared for a company that uses MSI services. Nothing like this was prepared for Brothers LLC. Garret claims that he showed Tyler and Toby Exhibit 17, although Tyler does not remember seeing it. It is a highly simplified and generalized projection on one-third of a page of how charges might be calculated and not a proposed schedule of costs for services. Whether or not the document was shown to them, there was no discussion of rates for services or whether the amounts billed would include contributions toward MSI's overhead or profit or simply be the base cost of the expense of the employee. There was also no comparison of what the cost of 'a la carte' services was likely to be compared to projected costs of hiring employees or obtaining services from other companies. Tyler and Toby trusted Garret and accepted his representation that it would be less expensive for Brothers LLC to use 'a la carte' services from MSI and Sunrise rather than hire its own employees or use independent service companies.

In September of 2018, Brothers LLC purchased the business assets from THCo for $2,716,909 with no down payment. Brothers LLC executed a note that called for monthly payments of $15,000, and each of the brothers guaranteed the payments, which were to be made to Tom's renamed corporation. Terry Owen continued to work with the brothers for approximately a year after the transition but she was no longer in charge of financial management.

There is no evidence that there was ever a discussion or agreement among the brothers as to responsibility for financial management. Garret simply took that role. He worked with Melanie Clark, an employee of his at MSI who provided CFO/executive level services to MSI customers, to determine what to charge Brothers for various services that would be performed by MSI and Sunrise employees. Her time was billed to Brothers LLC at her CFO rate, and time for other MSI employees was billed at various rates for bookkeeping, accounting, IT, and human resources. These rates included a markup. Whether it was for overhead or profit or a combination is unclear. There was no review of the rates with Tyler and Toby.

Melanie Clark, acting as CFO for Brothers LLC, set up the books for the LLC on Quickbooks and MSI personnel set up related IT for bookkeeping and accounting functions. The files were on the MSI server in the MSI office. Tyler and Toby did not have access to log in themselves to look at the financials. MSI functioned as the business manager for Brothers LLC. Everything was done at MSI offices and not at the Brothers LLC office on Cadys Falls Road. Garret controlled the checkbook of Brothers LLC, which was also kept at the MSI office. Garret

6

and Melanie developed the hourly rates to charge for each MSI employee who worked on Brothers LLC matters. They included a markup over the amount paid to the employee by MSI.

MSI prepared invoices to be paid by Brothers LLC to MSI and Sunrise, and Garret paid them or directed that they be paid. Tyler and Toby received cash flow and profit and loss reports. They had no access to supporting documents to show what was being billed for and at what cost without physically going to the MSI office during business hours, which was not realistic as they were working long hours in the field. They were told they could ask questions and get answers. While cash flow reports were sent to them, they did not know how to read and understand them. While there were invoices for the amounts billed, the reports they received did not include descriptions of the work performed. Garret did not offer to explain financial reports to them. Garret essentially took on sole responsibility for all financial matters without sharing information with Tyler and Toby, who let this happen but trusted that his interest was the same as theirs.

At some point in 2018, Brothers LLC made a $10,000 distribution to each of the members, separate from their regular compensation. How this came about is unknown.

In December of 2018, there was a shortfall of cash in the business. Garret put in $20,000 to cover it. There is no evidence that he discussed this with Tyler and Toby. There was no agreement as to how this infusion of money would be treated. That is, there is no documentation treating it as an additional capital contribution, and no terms were agreed upon to treat it as a loan, with or without interest or on what terms.

*2019*

Garret set up a line of credit through his company Sunrise to help out with periodic shortages of cash in Brothers LLC. When Brothers LLC was short of cash, Sunrise obtained it from its line of credit, and then Brothers LLC repaid the advances when cash was available. It is unknown whether Tyler and Toby knew about this at the time. (It ended in July of 2020.)

Group LLC closed on the purchase of the business real estate in February. The $300,000 down payment had come from Garret, with the balance financed through bank and VEDA loans. The real estate consisted of the original Cadys Falls Road business property in Morrisville where the main office and commercial buildings were located and two properties in Williston that were used for the weekly auto auctions as well as other auctions.

Throughout 2019 there were cash flow shortages, although business activity was steady and comparable to prior years. Melanie Clark decided when to pay what bills, and Garret decided when to advance cash to Brothers LLC. Garret put in periodic cash infusions totaling $110,000, again with no agreement with Tyler and Toby as to how they would be handled. [4] Some was paid back from Brothers LLC funds, leaving $75,430 unreimbursed. Repayments were for the amount advanced only, without interest.

---

[4] The advances came from MSI funds. The parties have agreed to characterize them all as having been made by Garret.

Tyler and Toby continued to receive profit and loss reports but did not know how to interpret them. They also saw some MSI invoices and Toby thought the cost was high, but Garret had said it was cheaper than other ways of getting services and Toby did not question the impact on the bottom line.

In March of 2019, Garret and Melanie Clark reviewed the amounts MSI and Sunrise were billing Brothers LLC, and decided to reduce their billing rates. They made the changes retroactive to January 1, 2019. Tyler and Toby were not involved in this process. They learned about it in July, after it happened.

Overall, Garret and Melanie Clark were managing the funds of MSI, Sunrise, and Brothers LLC without input from Tyler and Toby.

Toby and Tyler were each working full time as they always had, each working approximately 50-60 hours per week. They each used a vehicle provided by the business. Garret was responsible for the auto auctions and traveled to Williston for the weekly auctions plus 1 or 2 other times per week. An MSI employee was managing the auto auction under an independent contract that was billed to Brothers LLC. (There had been an auto auction manager working under Tom when he owned the business.)

In addition to MSI billing Brothers LLC for Garret's compensation, Garret had MSI bill Brothers LLC for a fixed weekly amount for an automobile allowance for his travel to and from Williston. He considered that this was comparable to the benefit that Toby and Tyler were receiving by driving company cars. The allowance was determined by Garret based on an estimate of travel to Williston three times per week. There is no evidence that Toby and Tyler agreed to this. If it had been discussed, they might have agreed to that arrangement or another one for the purpose, such as a business vehicle for Garret on the same terms as Tyler and Toby each had.

In June-July, Toby requested specific contract labor reports from MSI, and asked that it be "as granular as possible." He saw that Brothers LLC was paying a significant amount for accounting services from MSI. He knew that under his father, bookkeeping for the business had been done by an in-house employee who did the work in less than 40 hours per week.

In August or September, Tyler heard that there was a money problem. He was asked to put in money, and wanted to know how much to put in. He did not have access to the financial software. Although he could have gone to MSI to log in, he had no time to do that during MSI business hours. He was concerned about MSI invoices but was assured that they were cheaper than hiring employees.

In October, Garret suspended paying MSI invoices billed to Brothers LLC due to cash flow problems. There is no evidence that he notified Tyler and Toby when he did this. Some invoices were later paid.

Terry Owen left working with Brothers LLC toward the end of 2019, having been there a year after the turnover, and Toby or Tyler suggested that since they would be taking on her role and the business would not have the expense of her salary, Toby and Tyler's compensation be

increased by sharing what she had been paid. There is no evidence that Garret brought to their attention that Brothers LLC had unpaid bills to MSI, and that an alternative would be to use the money previously spent on Terry Owen's salary to become current on unpaid bills and/or replenish cash. There was no thoughtful analysis or conversation among the brothers about the wisdom of increasing their compensation at this time when there were cash flow problems and invoices were unpaid. Tyler did not understand how bad it was. Garret's response to the proposal was to say that he would take the same amount as the others, which is what happened. This increase in compensation to all three did not help the financial condition of Brothers LLC.

Toby was surprised to learn from Garret that the business was losing money and that there was no cash. He began asking questions about financial matters and the condition of the business. He did not get much information from Garret. At one point when Toby was trying with difficulty to understand a report, Garret simply said, "you should go find someone to help you."

Tyler wanted to understand why the business was in financial trouble, which surprised him based on the work he knew they were doing. Garret told Tyler and Toby that they were free to ask questions of MSI staff at any time, but he did not engage in discussion with them or provide help in understanding the content or meaning of the financial reports that were distributed.

*2020*

In early 2020, Toby and Tyler were asking more questions about the state of finances and not getting answers. Then the Covid pandemic hit and paralyzed the auction business, as people could not attend events where others congregated. This was a setback for the business, which survived it. They shifted to holding auctions that included remote participation and have continued that practice to the present, which has resulted in increased numbers of participants.

At some point Tyler and Toby questioned whether Garret was pulling his weight. They observed that he attended meetings on Monday with them and auto auction meetings on Tuesday in Williston and attended the weekly auctions on Friday or Saturday but did not know if he spent additional time on behalf of the business. He operated out of his office at MSI. Brothers LLC was being billed by MSI for an auto manager in Williston. While there had also been a paid auto manager employee in their father's time, Tom had been very hands-on himself. They questioned whether the MSI employee was the one actually doing the work that their father had done and that they had expected Garret would do. The trial evidence does not resolve this issue one way or another. At some unknown time during Garret's period of responsibility for the auto division, Garret, working with the auto manager and Tyler and Toby, modified the method for commissions from auto auctions, resulting in increased commissions which was a financial benefit to the business. The level of impact is unknown, but the business continues to use this method.

Tyler, who had a real estate agent's license but not a broker's license, was looking for a broker with whom to associate for real estate sales. Having a broker in the business would allow it to sell real estate properties that did not sell at auction. Tom had been the broker for THCo but was not willing to serve as the broker for Brothers LLC. Garret said that an MSI employee

9

named Conrad was considering getting his broker's license. Thus they made what Tyler thought was a plan that when Conrad got his license he would work for Brothers LLC. Then Garret's attorney notified Tyler that Garret was going to start a new real estate business himself called MSI Realty, and that Conrad would be working for it rather than for Brothers LLC. Tyler was surprised that Garret would start a business that might be in competition with the real estate division of Brothers LLC and employ Conrad in it. He no longer trusted Garret.

The evidence is clear that up to this point, Garret had been solely in charge of all financial matters and decisions. He was acting in the role of CEO without input from Tyler and Toby, and using his MSI staff for Brothers LLC work, specifically having Melanie Clark function as CFO. MSI was billing Brothers LLC for such services. Tyler and Toby had raised no objections and allowed this to happen. They were receiving financial summaries with limited information and told that they could ask questions of MSI staff. Because of their inexperience in management and financial responsibility, they had difficulty understanding the reports and knowing what questions to ask or what information to seek. This contributed to their acquiescence in allowing Garret to function as a CEO, but they also trusted that his interests were aligned with theirs. They essentially ceded that role to him and it was a comfortable and familiar role for him as he was CEO of his own business. In such a role, it is not uncommon for compensation to not be measured by time spent but by impact on the organization. Garret and Melanie Clark were providing CEO and CFO services to Brothers LLC, without specific agreement from Tyler and Toby on the decisions they made. This continued until early 2020.

In March, Tyler and Toby, having begun to want more information about the financial condition of the business, wanted to move the financial records kept at the MSI office to the Cadys Falls Road office, as provided for in the Operating Agreement. Garret resisted. Garret's response was that Tyler and Toby should come up with a financial plan. When Toby provided one, Garret said he needed more details and continued to retain the records. In May, without having provided access to the financial records, Garret proposed that the others buy him out for $650,000. The three brothers had discussions about ending their arrangement, but Toby and Tyler did not have an understanding about the health or value or financial operations of the business and wanted to see the detailed records. Garret still would not provide financial records, claiming again that first they needed to present a plan.

In June, Tyler and Toby wanted a face-to-face discussion of finances. Garret wanted a written explanation of what they believed the problems were before he would agree to meet. Tyler and Toby made a formal resolution for a members' meeting. Garret said he would not attend because he had not had enough time to review the agenda. Tyler and Toby postponed the meeting to allow additional time. Garret said he could not attend. They postponed it again so that he could. Garret sent an email saying that he would not attend and that he was going to involve his lawyer.

There was insufficient money to make the $15,000 loan payment to Tom in July, and Garret caused MSI to make it. In late July, Garret made another proposal to be bought out, still not providing the financial records. At about the same time, Garret purchased a parcel in

Williston that adjoined the Group LLC auction property. A few days later he proposed to acquire the auto division of Brothers LLC and the Williston real estate of Group LLC.

Garret testified that he intended all the cash advances he made to Brothers LLC to be loans, but he acknowledges that there was no documentation establishing a loan agreement or interest obligation in connection with them. There is no evidence that Tyler and Toby even knew about many of these advances, or the need for them, until mid or late 2020, nor were they asked to participate in making them. There were no loan agreements or agreements about how the advances would be handled. Some were repaid partially or fully, and without interest. At some point when Garret told Tyler and Toby that they had to put money into the business, they put in $125,000, again with no discussion or arrangements as to how it would be treated, just as was the case with Garret's advances. Tyler and Toby have been reimbursed, apparently without interest. In August, Garret made the last of his periodic infusions of cash into Brothers LLC.

In August, Tyler and Toby, having tried unsuccessfully since March to get the financial records, filed suit through counsel to have the books moved to the office of the company on Cadys Falls Road as called for in the Operating Agreement.

The brothers stipulated to a settlement of the lawsuit: the books were to be moved to the Cadys Falls Road office and the brothers agreed to have a third party inspection done of the books, as Garret wanted a 'clean bill of health' over the status of the records that had been solely in his hands. The stipulation stated that Garret would continue to be an independent contractor, but was silent as to a contract amount or any definition of the work for which compensation would be paid. Garret interpreted this to mean that his equal compensation would continue, and MSI continued to bill Brothers LLC for Garret's compensation.

At the end of August, before the books were moved to Cadys Falls Road, Garret made another proposal to end their relationship. Tyler and Toby still did not have enough information to evaluate any financial proposal.

In September the books were transferred to the Cadys Falls Road office. Toby, his wife Jen, and Terry worked on understanding the content of the financial records. Tyler and Toby began to make new arrangements for services previously done by MSI and Sunrise. They hired an in-house bookkeeper. The first one they hired turned out not to be up to the task. They had invited Garret to participate in the interview, but he had refused. In October they stopped using services from MSI and Sunrise. MSI continued to send invoices for compensation and an automobile allowance for Garret.

Tyler and Toby suspected that Garret's priority was his own company and not Brothers LLC, and that he had been having his MSI employees do his work and billing Brothers LLC for it in addition to billing for equal compensation. They decided that each should keep track of their hours worked and that the compensation each received for work should be at an hourly rate. They proposed this, and Garret refused. Tyler and Toby began keeping track of hours worked. Garret did not.

In December, Garret filed the first of the three lawsuits before the court, seeking dissolution and winding up of Brothers LLC. (He has since withdrawn that request.)

*2021*

In January, Tyler and Toby removed Garret as an employee of Brothers LLC. He continued as a member and was welcome to attend members' meetings, which he did for a while. As of the end of January 2021, the total amount of unpaid invoices from MSI for Garret's compensation, suspended since October 2019 by Garret, was $213,591.84.

Tyler and Toby assumed overall management of the business. Garret continued to cause MSI to send invoices for equal compensation. Tyler and Toby did not consider them justified as he was no longer working in the business, and they have not paid them. Terry Owen came back for a period of time to organize financial practices and to help Tyler and Toby as they took over all functions.

In April, the parties received the report prepared by MSI's accountant. He concluded that Garret's compensation was in line with Tyler and Toby's, and that Garret's automobile allowance was comparable in value to the vehicle benefits received by Tyler and Toby. He also concluded that the rates charged by MSI and Sunrise for their personnel were reasonably in line with market rates for similar services, although he could not evaluate whether the number of hours spent on various tasks was reasonable. In testimony, the accountant acknowledged that with respect to rates, he did not know 'who had made agreements to anything.'

Tyler and Toby ask the court to disregard the accountant's conclusion as lacking credibility because (1) the preparer did not research source data showing what the personnel who performed the services were actually paid even though the firm had the data since it is MSI's accountant, and (2) while charges were supported by invoices, the specific work done was not identified in the invoices. Tyler and Toby apparently believe that the report is insufficient to provide Garret with a 'clean bill of health.' They note that it was prepared by the accounting firm that Garret uses, suggesting that it reflects bias.

There is insufficient evidence to show that the billings are inflated. There is no evidence that services were not performed, and the bills may well represent what some businesses are willing to pay for such services in the market. That does not mean that the functions could not be done at less cost to Brothers LLC. Later, under Tyler and Toby, they were done at much less cost.

The problem with the bills is that the member/managers of Brothers LLC, i.e. the three brothers acting on behalf of the LLC, never agreed to the rates. Garret and his MSI staff set the rates, created the bills, and paid them from the Brothers LLC funds which they controlled in-house at MSI, all to the financial benefit of MSI. While Tyler and Toby apparently ceded the authority for this to happen during the first year and a half, by March 2020 they no longer did. They justifiably sought access to the books so they could review the expenses to address chronic cash shortfalls, and were denied that access by Garret, the very person who was setting the rates, creating the bills, and causing them to be paid into his own company.

*2021-2023*

Tyler and Toby have exercised full responsibility for the business since taking over in January of 2021. They supervise an employee manager of the auto division and conduct the auto auctions themselves. Management expenses are considerably less than when MSI managed the business. They have an in-house bookkeeper, Laura, who does bookkeeping, human relations, real estate, and general office work within a 40 hour work week. Jen, Toby's wife, works 20-30 hours per week on an hourly basis overseeing Laura and doing payroll, taxes, 401(k) administrative work, and general financial oversight. Bookkeeping costs $50,000 per year less than it did when it was done by MSI.

Brothers LLC has 12 regular employees, including Tyler and Toby, and employs several people part-time in the commercial and auto aspects of the business. In sum, Tyler and Toby have returned to their father's model of running the business with full and part-time employees rather than purchasing services. The business has healthy cash flow, but with no payments being made on the unpaid and disputed amounts of Garret's cash advances and MSI and Sunrise invoices.

Garret has not made any payments to Tyler and Toby arising from the Bridge Street matter since the first one paid in 2018. It is unknown whether Tyler and Toby have any enforceable legal right to that money. They do not seem to be aware of any documentation other than the schedule they were given. Garret acknowledges that he has not made any payments since the first one. He does not deny the obligation.

*Value of Brothers LLC*

The business was valued by experts on behalf of both Garret and Tyler and Toby. Both valued it as of December 31, 2022 because reliable 2023 year-end figures were not available to value it closer to trial. Both experts valued it at "fair value" as opposed to fair market value in order to value it as a going concern that generates income for the owners rather than as a business to be liquidated or placed in the marketplace for sale. Both agreed that the appropriate method of valuation is thus the income approach. The asset approach is inapplicable since the business's debt exceeds its assets. The market approach is also inapplicable, because since it is being operated by owners for their own income benefit, there is no need to consider adjustments for circumstances such as a partial interest, lack of control, and lack of marketability or liquidity.

Although they agree on many aspects of valuation methodology using the income approach, they arrived at different opinions of value. Garret's expert, Mr. Beliveau, valued the business at $950,000, with Garret's share as $316,000. Tyler and Toby's expert, Mr. Small, valued it at $147,000 with Garret's share at $50,000.

The primary difference between the two is that Mr. Beliveau adjusted owners' actual compensation downward to a level of compensation that is based on Bureau of Labor Statistics data indicating that the average compensation in the auction house industry is 4% of revenues. This data derives from companies all across the country and of varying sizes. Mr. Small considered such an adjustment unwarranted because in his opinion the actual unadjusted

compensation is a reasonable amount for the size and type of business in Vermont, regardless of what the statistics are for auctioneering businesses nationally with a wide range of sizes.

There are other less significant differences in their respective applications of the income approach. Each treated debt differently, although the impact of that difference is minor. Mr. Beliveau disregarded the experience of 2019 and 2020 because: those were the start up years, there were then three owners rather than two, and many functions were outsourced to MSI and Sunrise rather than being done by employees as they are now. Mr. Small did not disregard those early years as he considered that business operations were not all that different then, although he gave them less weight than 2021 and 2022 when Tyler and Toby were operating the business without outsourcing. Mr. Beliveau assumed growth of the business, whereas Mr. Small did not.

The court finds persuasive Mr. Small's opinion that it is unnecessary to make a downward adjustment in actual owner compensation just because Bureau of Labor statistics show a different level of compensation over a large number of auctioneering businesses of different sizes and in different locales throughout the country. The court finds Mr. Small's opinion that the level of compensation paid to Tyler and Toby ($154,500) is reasonable for small business owners in Vermont based on his review of salary data for Vermont maintained by the Vermont Department of Labor. Mr. Beliveau's April report on MSI and Sunrise invoices also supports this level of compensation for business managers.

Mr. Small's testimony, which the court finds credible, was that both experts used essentially the same valuation method, and that (a) without the downward adjustment for compensation that Mr. Beliveau applied, Mr. Beliveau's overall business value would have been $298,000 and (b) that the two values thus frame a range of $298,000 to $147,000 which represents an acceptable and reasonable range for defining the value of the business. The court finds this opinion testimony is grounded in credible evidence. Accordingly, the court finds that the value of Brothers LLC for purposes of this case is $222,500, which is both the mean and average of values within that range. Garret's equity interest is thus rounded to $75,000.

*Value of Group LLC*

The parties agree that the value of Garret's one-third interest in Group LLC is $300,000. They do not agree on the effect of Garret's initial $300,000 cash payment. Garret seeks reimbursement of the full amount, plus interest at the legal 12% rate. Toby and Tyler asked in testimony for the court to determine the status of that $300,000 and consequences for the parties. In their post-hearing filings, their attorney has argued that it should be treated as capital.

Garret acknowledges that the $300,000 Garret paid to Tom that was the downpayment on the real estate was not agreed upon by the members to be a capital contribution. He testified that he made it with the expectation that he would be repaid, but while that may have been in his own mind, it was not communicated to the others and the evidence shows that no agreements were made that it was a loan. This was a one-time downpayment toward the real estate to be purchased by brothers from their father, made at the time of the contract to purchase the real estate, unlike the cash advances made periodically by all three members of Brothers LLC to address cash flow shortages during business operations.

14

The court finds that it was neither a capital contribution nor a loan. It was simply money paid by Garret unilaterally. It is comparable to money paid by a family member for a child or sibling's downpayment on a house or car or business or educational opportunity without any agreement to treat it as a either a gift or loan: money simply paid voluntarily with no agreement to a legally enforceable right to reimbursement or other consequences.

## Conclusions of Law

### Garret's claims vs Brothers LLC

Garret claims oppression on the part of Tyler and Toby in that they withheld compensation to him, denied payment of invoices to his companies, declined to reimburse him for cash advances, and terminated his employment. He claims that the agreement that he would receive equal compensation, albeit in the form of independent contract payments, was central to his decision to enter into the Brothers LLC business with them, and that they have taken advantage of his minority position in an oppressive manner pursuant to 11 V.S.A. § 4101 (a)(5). Garret does not seek dissolution, but seeks reimbursement of funds advanced, payment of compensation and invoices, and an equitable remedy of either being bought out of Brothers LLC and acquiring Group LLC, or being bought out of both LLCs. He argues that Brothers LLC is only able to have current stability because of the unpaid debts to him and his companies, and that he would never have agreed to be a member but for the representation that he would receive equal compensation.

#### *Claim for Compensation*
Garret himself suspended payments to MSI for his contract compensation and automobile allowance in October of 2019. He seeks payment plus interest on unpaid invoices. Any recovery on these claims would be payable to MSI (not Garret personally) based on the independent contract arrangement between the parties. Nonetheless, whether MSI/Garret is entitled to these payments is dependent on the agreement between the members as to compensation.

The brothers agreed in organizing Brothers LLC that no member would be paid for simply being a member (i.e., attending meetings and doing general oversight over the entity), but that each would be responsible for one of the three divisions of business activity and paid equal compensation. They did not become any more specific than that, and each had different expectations about what that meant.

Tyler and Toby believed it meant that each would put in roughly equivalent working hours. This is demonstrated by Tyler asking Garret whether he would have the time to devote to Brothers LLC while he was running two separate significant businesses. Garret assured him that he would. Garret, on the other hand, appears to have believed that his equal compensation was based on him exercising responsibility for the division and was not dependent on hours worked, and that furthermore the level was guaranteed based on the fact that he would not have entered the business at all unless he was assured that he would be paid equally. There is no evidence that the parties ever agreed to either the Tyler/Toby or the Garret expectation.

Tyler and Toby believe that Garret did not live up to his bargain because he did not put in the same amount of time as they did and he used the business to feather his own nest. The evidence shows that up until January of 2021, Garret was exercising his role in the business as the person responsible for the auto division, and that he filled the need for financial management

15

as well, especially during the first year and a half during which time Tyler and Toby voluntarily left all management decisions up to him. Nonetheless, there was no agreement, written or otherwise, that the pattern of equal compensation would be permanent or would survive changes in business practices, organization, and responsibilities over time. The agreement was clearly that payment was to be compensation for work performed, and not for member status or exercise of membership functions. In January of 2021, work roles and the terms of compensation changed. The court concludes that Garret earned the contract amount of compensation payable to MSI and unpaid from October 2019 through January 2021. The issue of whether interest is due on unpaid invoices is addressed in the section below on MSI's claims against Brothers LLC.

Garret also claims reimbursement for the MSI bills for an automobile allowance that are unpaid. Again, if allowed, these would be payable to MSI, but because they relate to his employment status, the issue is addressed here. There is no evidence that Garret ever raised with Tyler and Toby whether he should receive an automobile allowance to equalize the benefit of company vehicles they were driving. The evidence does not show that the issue was ever discussed or any agreement made. It appears that Garret unilaterally determined that he should have such an allowance, determined what he thought it should be based on his own calculations, and caused MSI to bill Brothers LLC for it. Since he was controlling the books of Brothers LLC and the periodic reports did not have all invoices attached, Tyler and Toby apparently did not become aware of it. In short, while it might have been a reasonable thing to agree upon, there is no evidence that the members ever agreed to that expense. Garret's claim that MSI is entitled to unpaid invoices for an automobile allowance for Garret is denied.

### Cash advances

Garret claims that he (individually or through MSI) is entitled to reimbursement for cash advances made by MSI or him to Brothers LLC. He claims that they should be treated as loans and furthermore he claims interest at the legal rate of 12%.

The evidence supports the conclusion that Garret used MSI funds within his control to advance the following amounts to Brothers LLC to meet cash needs:[5]

| Date | Amount | | |
|---|---|---|---|
| 12/7/18 | $20,000 | | |
| 3/12/19 | 40,000 | | |
| 7/3/19 | 50,000 | | |
| 7/26/19 | 20,000 | | |
| | 130,000 | Unrepaid portion: | 95,430 |
| 1/10/20 | $20,000 | " | 20,000 |
| 2/10/20 | 100,000 | " | 100,000 |
| 7/15/20 | 15,000 | " | 15,000 (monthly payment due Tom) |
| 8/14/20 | 30,000 | " | 30,000 |
| | | | |
| Total unrepaid cash advances | | | $260,430 |

This was part of a pattern in which there were other occasions when Garret advanced funds to cover cash needs, and Brothers LLC repaid the advances without interest. As the

---

[5] Garret also claims roughly $12,000 in reimbursement for business expenses charged to credit cards, but although they are listed on Exhibit 15, there was insufficient evidence to support those expenses as Brothers LLC expenses.

findings show, it is not known whether Tyler and Toby knew that this was happening in the early months. They became aware of it at some point, and advanced funds themselves to cover cash needs, and were repaid. The evidence shows that when cash advances were made by any of the members, there was no calculation or payment of interest upon repayment.[6] There is no evidence that there was ever any agreement between the brothers to treat these as interest bearing loans. The evidence supports a tacit mutual agreement to waive interest.

There is also no evidence that these advances were ever intended to be capital investments on the part of Garret. There is no documentation to support such a contention, and it is inconsistent with the pattern of treatment of periodic advances of cash from not only Garret but Tyler and Toby. The court concludes that they were neither recognized by the members as interest bearing loans, nor capital contributions. They were treated as temporary loans from a member to be repaid, with interest waived, at time of availability of cash resources as part of the ebb and flow of availability of cash in the LLC.

Brothers LLC would be unjustly enriched if these advances were not repaid up through February 2020. There is no evidence that these funds were not needed, and the evidence shows that they benefited the business by keeping it afloat. The advances were made during the first year when there were one-time startup costs (setting up Quickbooks and accounting and related IT), and during early 2020 when the business was dealing with the inability to conduct auctions due to Covid. Thus, Garret is entitled to repayment of these sums from Brothers LLC.

However, the situation changed significantly after March 2020. Tyler and Toby sought to have the books and records located at the business office at Cady Falls Road in Morrisville. The Operating Agreement provided that is where they were to be kept. Garret was keeping them instead at his office at MSI, and actively refused to move them to Cady Falls Road. He was keeping them in his own office in a separate business in which Toby and Tyler had no interest, and he was exercising unilateral control over them. Tyler and Toby had no access to them, and thus no ability to analyze the expenses in order to address the cash shortfall problem. At this point, Garret's refusal to return the records frustrated the ability of the members to understand the finances of the business in order to manage it responsibly. Despite multiple requests and accommodations to his schedule, Garret refused to return the records and refused to meet or attend a members' meeting to address the financial condition of Brothers LLC.

In July, he made the monthly $15,000 to Tom, apparently because of a shortfall of cash. There is no evidence that he asked Tyler and Toby to advance $5,000 each so that Brothers LLC could make this payment. Garret, like Tyler and Toby, was obligated to make the payment personally under the guaranty each had signed to pay Tom if Brothers LLC did not do so. In August Garret made a cash infusion of $30,000. At that point he had refused to provide the books for a period of 5 months, and he had made several offers to be bought out without allowing Tyler and Toby access to the books so that they could determine if his offers were reasonable. The evidence does not support his claim to repayment of the total of $45,000 paid by Garret in July and August of 2020, as he apparently did not provide them the opportunity to advance cash, and certainly had denied them the opportunity to see the books so they could

---

[6]In contrast, when the Sunrise line of credit was used, interest was charged and paid to Union Bank.

determine if they could trim expenses, many of which were being paid to Garret's personal company.

As to interest, there was no agreement that interest would accrue, and no reasonable expectation at the time the advances were made that they would accrue interest. While 11 V.S.A. § 4060 (d) treats advancements as a loan subject to the accrual of interest, the financial records of Brothers LLC do not show that interest was charged despite the legal right to do so. There is no evidence of any agreement as to an interest rate. The course of dealing between the three members was that members were reimbursed for advancements when and to the extent that cash was available to do so and interest was waived. Therefore, as to the pre-March 2020 cash advances, the request for interest from the date of the advancements is denied.

Thus, Garret is entitled to $215,430, which is the amount he had advanced up until the time he obstructed the ability of Brothers LLC to conduct business by denying access to its books and by failing to attend properly noticed members' meetings.

### *Termination of Employment*
The members did not agree on a duration for the compensation terms they initially agreed upon. It is predictable that adjustments would need to be made over time in the operations of a new small business. With no specific agreed-upon terms in place, Garret had no reasonable basis for expecting that his employment status and compensation would continue indefinitely. Tyler and Toby followed appropriate procedure under the Operating Agreement in terminating his employment. Once his employment was terminated, there was no basis for continuing compensation to Garret. Therefore he is not entitled to compensation after January of 2021.

### *Oppression and Claim for Equitable Relief*
Garret has not proved his claim for equitable relief on grounds of oppression. He claims that he was "frozen out" of the business by Tyler and Toby, but it was he who refused to attend member meetings to discuss the operation of the business and refused to provide access to the financial records to the other members. While he is entitled to compensation through January 2021 and repayment for cash advances until March of 2020, oppressive conduct toward him on the part of Tyler and Toby, the other members, has not been shown. He had no reasonable expectation to continue to receive compensation in the same amount as Tyler and Toby indefinitely as there was no agreement to long-term employment and it was a new business, which might reasonably be expected to require adjustments from initial plans.

While it may have been in his mind that equal compensation was the reason he was willing to join Brothers LLC, the reality was that the only actual agreement between the members was that compensation was payable for work performed. The LLC had the authority to make changes in work allocation under the Operating Agreement and thus in compensation. The fact that it did so does not constitute oppression. Moreover, he was not terminated until after he himself had sued to dissolve the LLC.

Thus, Garret's claim for restructuring of the LLCs on the basis of oppression is denied.

## Tyler & Toby's claims against Garret for Dissociation

Tyler and Toby seek dissociation of Garret from both LLCs on grounds of breach of fiduciary duty. Accordingly, they seek the right to buy out Garret's interests in both LLCs.

### *Brothers LLC Claim of Breach of Fiduciary Duty*

Tyler and Toby claim that Garret breached his fiduciary duty when he usurped the opportunity of the auction business to acquire the Bridge Street property. At that time, the auction business was still fully in the hands of Tom. Brothers LLC was not yet even in the process of being formed. At that time Garret did not owe any fiduciary duties to Tyler and Toby.

Once Brothers LLC was formed, each of the brothers had fiduciary duties as required by statute and the terms of their Operating Agreement. Relevant to this case are the following:

## 11 V.S.A. Chapter 25, "Limited Liability Companies,"

### §4059: General standards of member's and manager's conduct

(a) The only fiduciary duties a member owes to a member-managed limited liability company and its other members are the duty of loyalty and the duty of care imposed by subsections (b) and (c) of this section.
(b) A member's duty of loyalty to a member-managed limited liability company and its other members is limited to the following:
    (1) to account to the company and to hold as trustee for it any property, profit, or benefit derived by the member in the conduct or winding up of the company's business or derived from a use by the member of the company's property, including the appropriation of the company's opportunity;
    (2) to refrain from dealing with the company in the conduct or winding up of the company's business as or on behalf of a party having an interest adverse to the company; and
    (3) to refrain from competing with the company in the conduct of the company's business before the dissolution of the company.
(c) A member's duty of care to a member-managed limited liability company and its other members in the conduct of and winding up of the company's business is limited to refrain from engaging in grossly negligent or reckless conduct, or a knowing violation of the law.
(d) A member shall discharge the duties to a member-managed limited liability company and its other members under this chapter or under the operating agreement and exercise any rights consistently with the obligation of good faith and fair dealing.
(e) A member of a member-managed limited liability company does not violate a duty or obligation under this chapter or under the operating agreement merely because the member's conduct furthers the member's own interest.

**§4058: Information rights**
(a) In a member-managed limited liability company, each member has the right, subject to such reasonable standards, including standards governing what information and documents are to be furnished and at what time and location, as may be set forth in the articles of organization, an operating agreement, or otherwise established by the members to obtain from the company from time to time and upon reasonable demand for any purpose reasonably related to the member's interest as a member of the limited liability company during the period in which he or she was a member:

      (1) information concerning the company's business or affairs reasonably required for the proper exercise of the member's rights and duties under the operating agreement or this chapter; and

      (2) other information concerning the company's business or affairs, except to the extent the demand or the information demanded is unreasonable or otherwise improper under the circumstances.

**Operating Agreement, Hirchak Brothers LLC** (Exhibits A and 13)
    **II. Membership Provisions**
    (9) Other Business by Members: Each member shall agree not to own an interest in, manage or work for another business, enterprise or endeavor, if such ownership or activities would compete with this LLC's business goals, mission, profitability or productivity, or would diminish or impair the member's ability to provide maximum effort and performance in managing the business of this LLC.
    **VII. General Provisions**
    (2) Records: The LLC shall keep at its principal business address a copy of all proceedings of membership meetings, as well as books of account of the LLC's financial transactions.

Vermont case law regarding small business corporations is pertinent to LLCs: "The relationship of a director-stockholder to his corporation binds him to use the utmost good faith and loyalty for the furtherance and advancement of the interest of that corporation. He is not permitted to make profit for himself in the transaction of the business of the corporation, against its interest." *Lash v. Lash Furniture Co. of Barre*, 130 Vt. 517, 522, (1972) (citation omitted); *J.A. Morrissey, Inc. v. Smejkal*, 2010 VT 66 ¶ 11.

Tyler and Toby claim that Garret breached his fiduciary duty to the LLC by taking advantage of their trust in him in connection with billings from MSI and Sunrise. They claim that he controlled the profit his personal businesses would make by providing services to Brothers LLC in which he imposed higher costs on the LLC than could be justified. They claim that his actions, such as agreeing to a member distribution to all at the end of 2019 when the LLC had cash flow problems, purchasing adjoining property in Williston personally, refusing to turn over the books, and continuing to put cash into the business to build up debt to himself show that he was working to acquire leverage over Tyler and Toby by putting the LLC in a debt position they could not afford so that he could acquire the auction business and Williston real estate for himself. For his part, Garret claims that Tyler and Toby were never provided with misleading

information and that information was always available to them but they chose to be "willfully ignorant" and not become educated about the finances of the business for which they were responsible.

The court finds that Garret violated his fiduciary duty to Brothers LLC in the following two ways.

(1) *Garret's conduct regarding Brothers LLC vis-à-vis MSI/Sunrise*

There appears to be no *per se* violation of the duty of loyalty and good faith and fair dealing in Garret's initial suggestion that the new LLC obtain 'a la carte' services from MSI and Sunrise rather than hiring in-house employees for certain functions. For a totally new business organization, it would make sense to have start-up organizational work, such as setting up accounting books and financial records, done by experienced, competent personnel. The fact that the LLC might purchase services from Garret's businesses does not, by itself, constitute a violation, as §4059 (e) does not prohibit all conduct that might involve a benefit to a member. However, Tyler and Toby's initial acceptance of Garret's suggestion does not absolve Garret of all responsibility under his duty of loyalty. The proposal was made on the basis of the highly generalized representation that it would be cheaper for the LLC. Tyler and Toby did not give Garret carte blanche to then set terms, without clear agreement, that benefited his businesses.

Garret's duty of loyalty required him to be absolutely transparent in financial transactions between the new LLC and MSI and Sunrise. His duty required him to provide the type of full disclosure of proposed rates and services to Tyler and Toby that he did to his independent customers. Exhibit 28 is a multi-page document laying out specific terms for work to be performed at specific rates. If Garret or MSI had prepared such a proposal it would have enabled the brothers to make an informed decision up front about whether to pay such rates. They might even have included a component for profit. It also would have allowed them to evaluate on an ongoing basis whether the LLC could afford the services at the rates charged or whether there were other ways of satisfying the functions at less cost, as they ultimately did. Instead, Garret claims he showed them a projection of what rates might look like. If he did it was not specific and was not actually used as the basis for an agreement as to services and rates. He then took over full control of establishing rates, generating billings from MSI and Sunrise, and paying the bills from LLC funds over which he maintained sole control.

Tyler and Toby claim that the rates are inflated, and that Garret should not have included a component for overhead or profit. If the LLC members, including Tyler and Toby, had negotiated specific explicit contracts with MSI and Sunrise, the issue of overhead or profit could have been sorted out.[7] Overall, Tyler and Toby have not proved that the rates were inflated compared to rates charged in the marketplace, but neither has Garret proved that they are not. The rates might simply have been at an expense level higher than the LLC needed. However, Garret's failure to make an explicit agreement as to rates and his lack of transparency to Tyler and Toby about the basis for billings and his subsequent complete control over the amounts billed to and paid by the LLC to his personal corporations constitute self-dealing and a violation of his fiduciary duty of loyalty to the LLC as well as a lack of good faith and fair dealing. Garret's conduct led to a complete loss of trust on the part of Tyler and Toby in Garret's loyalty

---

[7] As one of the brother's testified, a profit component could have been acceptable if the overall result was that the cost to the LLC was less than hiring employees.

to Brothers LLC and makes it impossible for the three of them to continue the business of the LLC together.

(2) *Garret's conduct relating to financial records*

The Operating Agreement is explicit that the financial records of the LLC were required to be kept at the LLC's principal place of business, which was the office at Cadys Falls Road. 11 V.S.A. §4058 is explicit that members of member-run LLCs have a right to access to the financial books and records.

For the first year and a half, Tyler and Toby acquiesced in the location of the books and records at Garret's office at MSI and their lack of direct access. However, once they sought more detailed information than periodic reports provided, and sought access to all the financial records to which they were entitled, Garret actively prevented them from having access to this information, which was fundamental to the running of the business. Starting in March of 2020, he continued to refuse access to the records for 6 months, such that they were forced to file suit, incurring unnecessary expense to do so, in order to finally obtain a fundamental member's right. They lost 6 months of the ability to examine the books and records during a period when the LLC was experiencing cash flow problems. Analyzing the financial books, including all supporting documents related to expenses for services, is step one in being able to address a cash flow problem.

The court concludes that this was a clear violation of Garret's duty of loyalty to the LLC and a violation of the obligation of good faith and fair dealing. It was a violation of the Operating Agreement and led to a six month delay in the ability of the LLC to evaluate its expense and cash flow problems and reorganize for successful operation.

*Other claim regarding Garret's conduct*

Toby and Tyler suggest that Garret violated his duty of loyalty to Brothers LLC by organizing and creating a real estate sales business, MSI Realty LLC, when Brothers LLC engages in real estate sales, and furthermore employing Conrad as its broker when the plan was that Conrad would become Brothers LLC's broker once he obtained his license. Proof of violation on this ground is insufficient for two reasons. First, there is a lack of evidence as to whether the idea of Conrad working for Brothers LLC was an actual agreed-upon plan, or whether it was merely floated as an idea. Second, it is not clear that MSI Realty LLC is actually in competition with Brothers LLC with respect to real estate sales. Brothers LLC engages in real estate sales for properties that do not sell at auction. While Tyler testified that Brothers LLC occasionally participates in pre-auction sales, the evidence does not establish that competition with real estate sales companies in general is a regular part of its business. There is no evidence that MSI Realty's business involves auction related sales. While the conduct of Garret in creating MSI Realty and employing Conrad as its broker reasonably raises understandable suspicions about his loyalty to Brothers LLC, the evidence is not sufficiently strong to prove a third violation of Garret's duty of loyalty to Brothers LLC as a basis for dissociation.

<u>Summary as to Brothers LLC:</u>

11 V.S.A. § 4081(5) provides :

A person is dissociated from a limited liability company upon the occurrence of any of the following events: . . .

(5) on application by the company or another member, the member's expulsion by judicial determination because the member:

    (A) . . .
    (B) willfully or persistently committed a material breach of the operating agreement or of a duty owed to the company or the other members under section 4059 of this title; or
    (C) engaged in conduct relating to the company's business which makes it not reasonably practicable to carry on the business with the person as a member.

Both Garret's self-dealing for the benefit of his own businesses without clear agreement with Tyler and Toby on contract terms, and his withholding of the financial records for six months until compelled to provide them in a lawsuit show violations of his fiduciary duty to Brothers LLC under (B) above. As a result, he created a lack of trust on the part of his fellow members, which was understandable and reasonable under the circumstances, and that makes it impossible for Brothers LLC to continue with Garret as a member. This constitutes a basis for dissociation under (C) above.

Brothers LLC is entitled to dissociate Garret pursuant to the two provisions cited above.

<u>*Group LLC Claim of Breach of Fiduciary Duty:*</u>

Tyler and Toby seek to dissociate Garret from Group LLC as well as Brothers LLC. They argue that control of the real estate is integral to the operation of the three types of auctions conducted by the business. The issue is whether grounds for dissociation pursuant to statute have been shown as to Group LLC.

Although the parties agree on the equity value of Group LLC, there is a significant controversy between the parties with respect to the payment of $300,000 that Garret made at the time of the agreement to buy the real estate from Tom. The findings of fact show that it was neither a loan that should be repaid with interest, as argued by Garret, nor a capital contribution on which no interest is payable, as argued by Tyler and Toby.

Garret's conduct created this controversy. He ignored Tyler and Toby's request to contribute equally to the initial payment, which they wanted to do as they were to be equal owners of the LLC. They specifically offered to contribute their interest in the proceeds of the Bridge Street property sale. Garret rejected their proposal and simply went ahead and made the payment on his own without seeking agreement on terms. There was no agreement that it was a capital contribution.

As to Garret's claim that it was a loan, it is not uncommon in family financial circumstances for one family member to contribute funds that benefit another without establishing any agreements as to the terms on which the money is contributed. The subject is treated in a leading treatise on contracts. In situations in which the response to an offer or provision of services is silence, the issue presented is whether silence amounts to acceptance of a possible agreement. The situation is treated differently when it occurs among family members.

> A very important factor is whether the services are rendered within a family relationship. Where the services are rendered within the family relationship the offeree ordinarily has no reason to conclude that compensation is expected. . . .If services are rendered within the family relationship there is a presumption that they were rendered without expectation of compensation. On the other hand, if there is not a family relationship the presumption is that compensation is expected. In either case, the presumption may be rebutted.

J. Calamari & J. Perillo, Contracts § 2-18, pp. 86-87 (3rd ed.).

In this case, Garret claims that he had an expectation of being repaid, but the evidence shows that the subject was not discussed and that any such expectation was only in his mind. The presumption is that the act was undertaken without expectation of compensation, and Garret thus has the burden to rebut the presumption. Garret introduced no evidence to rebut such a presumption. Therefore, he is not entitled to compensation on the grounds that the payment was a loan.

By refusing to let Tyler and Toby contribute their equal shares for the down payment for the purchase of LLC real estate in 2018, and then claiming five years later, during which time he made no payments of the Bridge Street money, that he is entitled to compensation not only for the full amount but with interest at the high legal rate of 12% per year, Garret has not observed his duty of loyalty to the LLC to observe the obligation of good faith and fair dealing as required by 11 V.S.A. § 4059 (d). As a consequence, he has violated a duty owed to other members under 11 V.S.A. § 4081 (5)(B), which is grounds for dissociation.

In addition, Brothers LLC has an intertwined contractual lease relationship with Group LLC because of the necessity of the use of the real estate in the business of Brothers LLC. It is unknown what the current terms of the lease are, but future negotiations could be required. As a result of his conduct that caused him to be dissociated from Brothers LLC, it is not reasonably practicable for Group LLC to carry on its business with Garret as a continuing member. Tyler and Toby have shown grounds for dissociation under 11 V.S.A. § 4081(5) (C).

## MSI Claim for unpaid invoices

**Garret's MSI contract compensation for responsibility for the auto division.** MSI is entitled to payment of the unpaid invoices for Garret's compensation pursuant to contract through January of 2021, during which time he was responsible for the auto division. After that he was no longer employed by Brothers LLC. The unpaid total is $213,591.84. There is no

evidence that there was an agreement that MSI would be paid interest on unpaid balances. Garret himself suspended payments of these invoices beginning in October 2019 without obtaining agreement from Tyler and Toby that interest would accrue on unpaid balances. There is no evidence that any MSI invoices ever showed a claim for interest on any suspended amounts.

**Garret's claimed automobile allowance.** For the reasons described above, MSI is not entitled to payment of invoices it generated on its own, without agreement with the members of Brothers LLC, for an automobile allowance for Garret.

**Invoices for work performed by other MSI staff.** MSI seeks payment for unpaid invoices for the period from October 31, 2019 to November 13, 2020 in the amount of $119,765.83 for CFO level services and services for auto auction management, human resources, accounting, and information technology. MSI also seeks interest at the legal 12% rate in the amount of $54.144.05 for a total of $173, 909.88. Tyler and Toby claim that there was never any agreement as to the specific terms of payment for services, and that many of the services were provided during the period when Garret as MSI's owner kept Brothers LLC financial records at MSI's office and refused to provide required access to them.

While the court has concluded that the failure of Garret to ensure that there was an explicit transparent agreement between Brothers LLC and MSI (with Tyler and Toby's involvement) was a violation of his duty of loyalty to Brothers LLC, there are other factors. One is that MSI provided services of value to Brothers LLC that it accepted. Another is that Tyler and Toby knew that the services were being provided and raised no objections until March of 2020, when they sought detailed information about the level of billings and were denied access. A fair allocation is that Brothers LLC is responsible for all billings through March of 2020 because there was acquiescence to those bills, but is not responsible for bills generated wholly within MSI during the period that the majority members of Brothers LLC were denied access to the financial information related to the bills. The total of bills dating from October 13, 2019 through March 31, 2020 is $71,537.64.

With respect to MSI's claim for interest, as with MSI's claim for payment for invoices for Garret's compensation, there is no evidence that there was an agreement that MSI would be paid interest on unpaid balances. Garret himself suspended payments of these invoices beginning in October 2019 without obtaining agreement from Tyler and Toby that interest would accrue on unpaid balances. There is no evidence that any MSI invoices ever showed a claim for interest on any suspended amounts.

Therefore the request for interest is denied.

## Sunrise Claim for unpaid invoices.

Sunrise seeks payment for unpaid invoices for the period from October 31, 2019 to November 13, 2020 in the amount of $57,073.12 for property maintenance services requested by Brothers LLC and provided to it. Sunrise also seeks interest at the legal 12% rate in the amount $26,763.30 for a total of $83, 836.42. Again, Tyler and Toby claim that there was never any agreement as to the specific terms of payment for services, and that many of the services were provided during the period when Garret as Sunrise's owner kept Brothers LLC financial records at MSI's office and refused to provide required access to them.

25

As with the MSI bills, a fair allocation is that Brothers LLC is responsible for all billings through March of 2020 because services were provided and there was acquiescence to those bills, but is not responsible for bills generated wholly within Sunrise during the period that the majority members of Brothers LLC were denied access to the financial information on which the bills were generated. The total of bills dating from October 13, 2019 through March 31, 2020 is $50,214.57.  No interest is payable for the same reason as set forth above with respect to MSI.

### *Brothers LLC Claim for Disgorgement based on Unjust Enrichment*

Tyler and Toby seek disgorgement of alleged profits made by MSI and Sunrise in 2018 and 2019.  Specifically, they seek $28,489 for 2018 and $24,175 for 2019 based on Mr. Beliveau's calculation of amounts billed over costs for those years. (Exhibit 32A, at 8.) The evidence was not clear that the billed amounts for those years, which have been paid, included a component for profit over and above overhead costs. Moreover, during that period Tyler and Toby acquiesced in the billings made by MSI and Sunrise to Brothers LLC. The court concludes that Brothers LLC has not proved its claim by a preponderance of the evidence.

### Brothers LLC request for attorneys' fees

Brothers LLC requests attorneys' fees in reliance on a provision in the Operating Agreement that the parties may seek to resolve disputes through arbitration, and if they do, the prevailing party is entitled to attorneys' fees. This request is denied for several reasons. First, this is not an arbitration proceeding. Second, as the findings and conclusions above show, while Brothers LLC prevailed on its claims for dissociation, it did not prevail on many of the claims of Garret, MSI, and Sunrise for financial compensation. Moreover, Garret did not oppose the remedy that the LLCs would be restructured so that his interest in each LLC would be bought out by the LLC.  Therefore, the request for attorneys' fees is denied.

### SUMMARY and ORDER

118-12-20 Lecv

Garret has withdrawn his claim for dissolution of Brothers LLC. Defendants' cross claim for unjust enrichment is denied.

Attorney Roy shall prepare a proposed judgment for review pursuant to V.R.C.P. 58 (d).

21-CV-1922

MSI is entitled to a judgment against Brothers LLC for $285,129.48 ($213,591.84 for Garret's contract compensation + 71,537.64 for MSI staff compensation = $285,129.48). Interest shall begin to accrue on any unpaid balance at the legal rate beginning 120 days after judgment.

Sunrise is entitled to a judgment against Brothers LLC for $50,214.57. Interest shall begin to accrue on any unpaid balance at the legal rate beginning 120 days after judgment.

Attorney Roy shall prepare a proposed judgment for review pursuant to V.R.C.P. 58 (d).

<u>23-CV-1511</u>

Garret shall be dissociated from Brothers LLC and Group LLC.

Brothers LLC shall pay Garret $75,000 for his equity interest in Brothers LLC within 120 days.

Group LLC shall pay Garret $300,000 for his equity interest in Group LLC within 120 days.

Garret is entitled to a judgment against Brothers LLC for $215,430.00 for cash advances. Interest shall begin to accrue on any unpaid balance at the legal rate beginning 30 days after judgment.

Attorney Henry shall prepare a proposed judgment for review pursuant to V.R.C.P. 58 (d).

Electronically signed January 30, 2024 pursuant to V.R.E.F. 9 (d).

*Mary Miles Teachout*

Mary Miles Teachout
Superior Judge (Ret.), Specially Assigned